_(Superior Court of Cook County.)_

## Illinois Glass Company
### vs.
## Chicago Telephone Company.

(Opinion of May 19, 1905.)

1. TELEPHONE COMPANIES—DUTY TO FURNISH MODERN EQUIPMENT AT RATES FIXED BY ORDINANCE. Where a telephone company accepts an ordinance under which it is permitted to use the streets of the city for the purpose of placing its poles and wires, and it is provided in such ordinance that the company shall not increase the rates then established for telephone service, the company is bound to furnish telephones of modern construction and appliances at the ordinance rate.

2. DURESS — PUBLIC-SERVICE CORPORATION — PAYMENT OF EXCESS CHARGES TO—RIGHT TO RECOVER BACK. Where a subscriber demands a telephone and he cannot procure the same without yielding to an extortionate demand and signing a contract to pay an excessive rate, and he does so yield, this constitutes duress and the excess may be recovered back in an action for money had and received.

3. DURESS—COMMON-LAW DOCTRINE—GROWTH OF. The doctrine of duress at common law was confined originally to duress of the person, but subsequently it was extended to include duress of goods. Under the modern decisions it includes "moral duress" or duress of business necessities.

4. SAME—WHAT CONSTITUTES—EXISTENCE OF ALTERNATIVE OR OTHER LEGAL REMEDY AS BAR TO RECOVERY OF MONEY PAID. Where a party for a number of years uses an inferior class of telephone service which is usable to the extent that it is possible to carry on a conversation subject to interruption, contracts for a higher grade of service at a rate in excess of that fixed in a city ordinance, the payment of such excess cannot be considered as involuntary where the party paying was not forced to have the better service and it could have obtained relief by applying for an injunction.

5. DURESS—ONLY EXISTS WHERE THERE IS NO ALTERNATIVE. Where a party is called upon to submit to an illegal demand and he has no other alternative but to submit, such payment cannot be considered as voluntary and he may recover back such amount.

6. SAME—NECESSITY OF PROTEST. Where a payment is made under duress, and a protest would be unavailing, no protest need be made. But if a protest would be availing to stop the payment of the money, a protest would be necessary.

(Opinion of August 24, 1906.)

1. TELEPHONE COMPANIES—RATES FOR TELEPHONE SERVICE—RIGHT TO INCREASE ON ACCOUNT OF IMPROVED APPARATUS. Where a city grants to a telephone company by ordinance the right to transact its business in the city and it is provided in such ordinance that the telephone company shall not increase to its present or future subscribers the rates then established for telephone service, such company has no right to thereafter increase its rates even though it furnishes an improved service not known at the time of the adoption of the ordinance.

2. SAME—DUTY TO FURNISH IMPROVEMENTS. Under such ordinance the telephone company cannot be required to adopt improvements in its service or equipment, but if it does so it is restricted to the rate provided for in its ordinance.

3. DURESS—WHAT CONSTITUTES—PAYMENTS MADE TO PUBLIC-SERVICE CORPORATION IN EXCESS OF LEGAL RATE. The plaintiff for a number of years made payments for an improved telephone service in excess of the rates fixed by ordinance. The plaintiff had previously had in his place of business an inferior type of telephone service at the ordinance rate. Both parties believed at the time of making the contract for such excess payment that the telephone company had the right to demand the excess payment. Nothing was said about the relative rights of the parties at the time the contract was made. The defendant was first approached by the plaintiff and the matter was concluded without protest on the part of the plaintiff and without any threat on the part of defendant to disturb the existing telephone service then in operation in plaintiff's place of business. The evidence did not disclose an immediate necessity for the improved telephone service as the inferior service was usable and practically efficient. *Held* that such payments were voluntary and could not be recovered back.

4. DURESS DEFINED. Duress exists when one by the unlawful act of another is induced to make a contract or perform some act under circumstances which deprive him of the exercise of free will.

5. SAME—CONSCIOUSNESS OF ILLEGALITY OF DEMAND. To constitute an involuntary payment both parties must have a consciousness that the demand is unlawful at the time of such payment.

6. SAME—EXERCISE OF FREE WILL. And where plaintiff in making excess payments was under no immediate necessity of doing so and where nothing was said or done which deprived it of the exercise of its free will, the payments will be considered as voluntary.

7. SAME—SUCCESSIVE PAYMENTS. Where payments are made successively for nearly five years without any discussion or con-

tention of any sort, and without any protest, or suggestion that the amount was excessive, no recovery can be had.

8. SAME—WHEN PAYMENTS ARE VOLUNTARY—KNOWLEDGE OF RIGHTS. Money voluntarily paid, without protest, and where there is not present the element of duress, cannot be recovered back, where it appears that the parties either knew or were chargeable with knowledge of their rights, and of the unlawful exaction at the time of payment. This is the rule in tax, water and gas cases without exception.

9. SAME—IGNORANCE OF LEGAL RIGHTS—ALTERNATE REMEDY. Where plaintiff mistook his legal rights under an ordinance, and in ignorance of the law affecting the contract, freely, tamely and unprotestingly entered into it, and in faith of it uncomplainingly and voluntarily continued for nearly five years to pay the excessive contract price, a condition which could have been relieved by protest or by the aid of an injunction, no recovery could be had.

10. MUNICIPAL ORDINANCES—IGNORANCE OF, ONE OF LAW. An ordinance granting to a telephone company the right to use the streets of the city,—in which ordinance it is provided that the telephone company shall not increase its established rates for telephone service—has the force of law within the limits of the municipality, and ignorance of the provisions of such ordinance is ignorance of law and not of fact.

11. MAXIMS—EX ÆQUO ET BONO. The maxim of *ex æquo et bono* is one of equity.

12. SAME—RECOVERY OF MONEY WHICH DEFENDANT IN EQUITY AND GOOD CONSCIENCE OUGHT NOT TO RETAIN. A recovery can not be had *in an action at law* for money paid merely because the defendant *ex æquo et bono* ought not to retain it. But this maxim may receive an additional exemplification in equity.

Action of assumpsit. Heard before Judge Jesse Holdom and a jury. Verdict directed for defendant at close of plaintiff's evidence, May 19, 1905. Motion for new trial overruled August 24, 1906. Gen. No. 231,203.

Statement of facts.

The plaintiff, Illinois Glass Company, a corporation, commenced its action in assumpsit against the Chicago Telephone Company, on July 17, 1903, to recover charges for telephone service rendered it by defendant in excess of rates fixed therefor in defendant's ordinance. The declaration consisted of the common counts. The defendant pleaded the general issue

and the five year statute of limitations. A trial was had before the court and a jury, and at the close of plaintiff's evidence the court, instructed the jury to find the issues for defendant. A motion for a new trial was overruled, and judgment was entered against plaintiff.

The defendant was organized in 1884 to carry on a telephone business. On January 4, 1889, the city council of the city of Chicago passed "an ordinance authorizing the Chicago Telephone Company to construct, maintain, and operate a line of telephone wires in the city of Chicago."

By section 1 of the ordinance permission and authority were granted defendant to construct, maintain and operate in the public streets and alleys of the city of Chicago, for twenty years, a line or lines of wires, or electrical conductors for the transmission of sound and signals only by means of electricity.

Section 6 provided: "Said company, during the term for which this ordinance is granted shall not increase to its present or future subscribers the rates for telephone service now established. And provided, also, that with the acceptance hereinafter required, there shall be filed by said company a schedule showing the rates charged by said company for telephone service at the date of the passage of this ordinance within the limits of the city of Chicago."

The schedule of rates provided: "Within the blue lines on the map of Chicago attached hereto and made a part hereof, we charge $125 per annum for telephone instruments connected by wire with our exchange, for the business use of the lessee and his employes alone."

The evidence disclosed that the defendant had a complete monopoly in the city of Chicago in the telephone business; that in 1889, the time the ordinance in question was passed, the defendant had but one kind of telephone service, known as a grounded circuit; that in 1893 it introduced a greatly improved service known as a metallic circuit service which to a large extent was free from inductive disturbances to which the grounded circuit was subject; that the legal charge under the ordinance within the "blue line" district, for a business telephone was $125 per annum; that the defendant charged

$175 per annum for its metallic circuit service; that it was the custom of defendant to require every one of its subscribers to sign a contract; that if any person desired a metallic circuit business telephone within the "blue line" district he was obliged to pay $175 per annum therefor; that the plaintiff also leased from the defendant an extension telephone for which it paid at the rate of $50 per annum which was later reduced to $30 per annum; that such extension telephones were not furnished in connection with grounded line instruments; that all payments for telephones were required to be made quarterly in advance. The plaintiff originally had a grounded circuit telephone but experienced considerable trouble in hearing and getting connections; that plaintiff was informed by the defendant that if they wanted better service they would have to get a metallic circuit telephone and would have to pay therefor $225 for such telephone and an extension. The plaintiff for the purpose of getting better service and procuring an extension telephone, signed a contract for the new equipment and paid the excessive rate for five years, and then sued to recover back such excess. A large amount of evidence was introduced to show the unsatisfactory nature of the grounded line service and the superior service rendered by the metallic circuit.

At the close of the plaintiff's case the court instructed the jury to find the issues for the defendant. A motion for a new trial was thereafter overruled and judgment rendered on the verdict. Two opinions were rendered, the first upon the motion of the defendant to direct a verdict and the other upon the motion for a new trial.

*Isaac H. Mayer*, of *Moran, Mayer & Meyer*, attorney for plaintiff.

*Charles S. Holt*, of *Holt, Wheeler & Sidley*, attorney for defendant.

(Opinion rendered May 19, 1905.)

HOLDOM, J.: (orally)—

I have listened attentively to this very interesting and protracted argument of counsel for both sides in this case with a

great deal of interest. It is not a question that is entirely free from doubt, so far as the decisions which we have been over are concerned, and there are cogent reasons in law for the position taken and contended for by the champion of either side in this court.

It is not only a very interesting question, but it is a very important question on principle, on the rights of the parties and more especially as to the rights of others whose interests underlie this particular case, which, being not measured by the underlying interests would be of no importance and this extended investigation, I am free to say, would not have been indulged by the court.

In judicial history, a case akin to this, following the same principles, on the equity side of the court, is the Illinois Manufacturers' Association case against this defendant, reported in 106 Ill. App. 54. I want to say now, before I say anything else, that I feel constrained to hold that wherever the principles enunciated in this case are involved and are applicable here in the case at bar, I am bound. So I may say that in the logical reasoning of the decision of the learned chancellor at *nisi prius*, Judge Tuley, so far as that opinion is not clearly *obiter*, I am bound.[1]

I am of the opinion that under the ordinance of the city of 1889, section 6, accepted by the defendant, that they were bound to furnish telephones of modern construction and appliances to the subscribers for $125.00 per annum and they are not under the law, under that ordinance, entitled to charge $175, the contract price agreed upon by the parties in the case at bar.

The motion is to instruct the jury on the evidence of the plaintiff to find the issues for the defendant, and that is upon the theory that the questions of fact resolve themselves into one of law, namely that the plaintiff is not, under the evidence, with all its legitimate intendents to be drawn from it, entitled to recover. As I have looked upon this case the last few days, and I have not changed my opinion yet, that there

---

[1] *Illinois Manufacturers' Association, et al. v. Chicago Telephone Company*, 1 Ill. C. C. 119.—Ed.

lies at the foundation of this case, and it is the pivotal and turning point, the fact of whether or not this evidence establishes the claim of duress, and that aside from any question of protest.

Now, as I have said, it is not easy to agree upon legal principles. You gentlemen, sitting in consultation at times with other counsel associated with you, sometimes against you, where you are seeking to attain to a legal conclusion on facts, which you are ready to admit in order to obtain a settlement, will agree upon the law but will very much disagree on its application, even to the agreed facts. So, while we haven't much disagreement about the law, the difficulty is in applying the legal principles to the facts of the case in hand. There are no cases that on the facts are akin to this case at bar. I am free to admit that had this plaintiff gone at the time it did, in 1897, to the telephone company, and then being without a telephone, had said ''We want a telephone, we have a right to this telephone, we want the metallic circuit, we want it for $125 a year,'' and the company had refused and said ''No, we can't do that, the service has been improved since the passage of the ordinance; that that wasn't the service contemplated by the ordinance, we have got the grounded service which we will furnish you, and that was the kind of service contemplated by the ordinance'' and then the plaintiff had yielded to the demands so further made by the telephone company and had signed the contract for $175.00 a year, I think I should hold without any sort of hesitation that that was duress.

Now, the old doctrine of duress was first to the person, and then to the goods and then there has been interpolated by the more modern decisions, moral duress, which is construed to mean business necessity, and this case, if it falls within either of these definitions, must fall under the latter one of moral duress.

Graham is the only witness that testifies in relation to what was said and done at the time of the making of this contract for the metallic circuit service and he did that in consultation with Mr. Levis. They had a telephone which had proven unsatisfactory, sufficient, with trouble, to conduct their tele-

phone business over it. There were these interruptions; Graham seemed to complain more about the "busy" buzz than anything else, but I think that is immaterial. I think this evidence shows that service was growing worse and that they needed the advantage of the development of the science of the telephone and the telephone system and they really needed, for comfort, the metallic circuit service. He was willing, under the instructions of his superior officer in the plaintiff corporation, to make the bargain he did make. Levis said "Do the best you can, if you have to do it, do it." I don't want to be understood as intimating that that is a good contract, because the 106 Ill. App. 54 says it is not, and I agree with it. It is only pertinent to the question of duress. In some of these cases, one of them particularly, it has been stated that the courts differ in relation to this question of duress, but in order to constitute duress, the parties all agree the payment must be involuntary, and that is the question here. Was there an alternative way out of the difficulty? Were they forced to have the metallic circuit service? Were they at the mercy, as it were, of the telephone company? Was there this moral duress in relation to their business that their necessities were such that they must have this metallic service and therefore had no time to stop and straighten out the difficulties and demand their rights? In other words, couldn't they have gone on using the grounded service for just a little bit longer while they applied to the court for an injunction, as was done five years afterwards? That was done and they could have done it just as easily in the first place as was done by others five years afterwards. In these cases that hold there was duress are the cases of the gas company, a monopoly, a public utility corporation; there was no alternative. It must be that gas or no gas. In the water case, the case of the water company of the city of Chicago[1] controlling the water works, that is a monopoly business, water is a necessity and our forefathers got along with very little water, but we need a good deal and socially water is a necessity; therefore in the Northwestern Mutual Life Insurance Company case,[1] when they

[1] *City of Chicago v. Northwestern Mutual Life Insurance Co.*, 218 Ill. 40.—Ed.

took that property under their mortgage and found resting upon it the claim of the city for back water taxes and where the city said "Unless you pay, we will disconnect this water service," that was duress. They had no alternative; they must have water; that was a necessity; they could only get it from the city and therefore there was duress and money paid in that way could be recovered, because it was involuntary.

Where there had been unjust discrimination in freight or where the freight rates were unreasonable, in these railroad cases, you will find in each one of those cases there was no alternative; whether paid under protest or not, the fact of duress existed; duress, of a moral character, of business. The goods must go now; the goods must come out of the freight house now, whether perishable or not, made no difference; they must be used in the business of the party, which is a business that can't stop for a law suit or the slow processes of the court. Therefore in all of those cases there was duress.

In the Yates case,[1] it was not held to be duress and yet large sums of money were paid, and the supreme court held, voluntarily—under what? A void law. The supreme court had nothing to do with what the rest of the law was; it was not involved in that case and they had nothing to talk about, and that was the only matter before them—the question whether the insurance company was entitled to recover back the money which it was admitted was paid under a void law. There was no necessity of paying it in the first instance. They held the payment not being compulsory, there was no duress and therefore it was a voluntary payment and they could not recover it back.

There is no pretense that anything was ever said between Graham or any other officer of this company to the telephone company which would indicate that there were any protests, although the way I look at this case, it was not necessary; if if there was duress, I am inclined to concede Mr. Mayer's contention as to the law at the present day in this state; that if there is duress, and a protest would be unavailing, then no protest need be made. If you had a case where there was

[1] *Yates v. Royal Ins. Co.*, 200 Ill. 202.—Ed.

duress and where a protest would have been available to correct the difficulty and to stop the payment of the money, then it would be necessary, I take it, that the protest should be made.

Now, those are the facts in this case and they are in a very narrow compass, and we have to look, of course, at the condition of the parties at the time this illegal contract was made. It does not detract from its illegality that it was not made under duress. It is the other principle of law, that whether it was a voluntary or involuntary payment, and there being no duress, can it be recovered back in this common-law case. I can't see, if I am right, that there is any question here for the jury; that there can be anything said about a doubt as to whether or not there was duress. It is all a question of law and it is one-sided. Of course, there is no dispute here, that is to say there is no contention only upon the question of what that evidence proves as a matter of law, and so I am inclined to hold that there was no duress shown by this evidence at the time, practiced by this defendant company upon the plaintiff at the time of the execution of the contract in evidence when the plaintiff had a grounded service telephone in his place of business, which he had had for several years and I feel quite positive that the evidence here does show that their grounded service was becoming worse all the time, that is, the interference was greater as time went along and I think the best evidence of that fact is not the evidence of the people who used the wires, but it is the testimony of the general manager of the telephone company to the fact that the metallic telephone service has been increasing as the years have gone by; since the time it became practicable to install this metallic circuit service that the grounded service has decreased so that today it would be one of the hardest things to find in the city of Chicago, unless you knew just where to go, a grounded service 'phone.

Mr. HOLT: I only want to interrupt to call your honor's attention to the fact that the defendant's evidence on that subject has not been put in.

The COURT: I am talking about the evidence that is in and

you must remember, Mr. Holt, when you make the motion, you admit it is all true, and I am only judging from the evidence. I want to say another thing; I am not going to consider myself bound by the conclusion I have come to. While I shall instruct the jury and so far as the trial of this first case is concerned, it will be practically ended, still it is a question of great moment, as I said before, and I am quite sensible of its importance and it impresses me, and I don't feel like shifting the duty that I owe to the parties here, to come to a right conclusion and I take it that you will make a motion for a new trial and if you do, I want both of you to prepare briefs so that I may give the case further careful and protracted examination and then after I have examined those briefs, I will hear you orally and I may give you a new trial.

(Opinion rendered August 24, 1906.)

HOLDOM, J.:—

This cause is now before the court on a motion for a new trial from a directed verdict. On the motion to direct a verdict three days of oral argument was indulged. On the motion for a new trial 300 printed pages of brief and argument have been suffered, and plaintiff asks and defendant foreshadows a request for further oral argument. In this condition of the record the court feels impelled, at the risk of a possible criticism of such action being arbitrary, to deny both parties the privilege of further discussion.

The Chicago Telephone Company is a public-service corporation engaged in the telephone business. It is an Illinois corporation, and as such derives its rights and powers to transact its business within the city of Chicago in virtue of an ordinance of the common council passed January 4, 1889. This ordinance required defendant to file with the city clerk a schedule of its charges, and provided that such schedule rates should not be increased during the time limited in the ordinance, viz.: twenty years. That part of the schedule pertinent here is as follows: "Within the blue lines on the map of Chicago attached hereto and made a part hereof we charge

$125 per annum for telephone instruments connected by wire
with our exchange for the business use of the lessee and his
employes alone.''

Plaintiff is a corporation under a charter granted it pur-
suant to the Illinois stautes on ''Corporations,'' and is en-
gaged in the glass business, with its principal office in Chi-
cago within the blue lines of defendant's schedule last quoted.

At the time of the passage and acceptance of the city ordi-
nance, *supra,* defendant operated its telephone service in Chi-
cago by what is known as ''grounded service lines.'' One of
such telephones was installed and in operation in plaintiff's
Chicago office, for which it paid at the schedule rate of $125
per annum. At the time of the original installation of plain-
tiff's telephone and the passage of the 1889 ordinance, the
grounded service was the only one in common use in Chicago.
In the course of time American ingenuity, responding to new
demands and necessities, the metallic circuit method was in-
vented. This new device overcame somewhat and minimized
the difficulties encountered in the operation of the grounded
lines by leakage of electric current and interference with the
transmission of sound over the wires, occasioned by contact
with foreign substances, such as gas pipes, electric light poles,
and other inductive disturbances. Plaintiff, having suffered
somewhat from an impairment of service over its telephone,
and having learned of the improved method of metallic circuit
service, applied to defendant for its installation in the place
of its grounded service. Defendant refused to install the me-
tallic circuit service for plaintiff for a sum less than $175 per
annum. This condition being communicated to plaintiff's
general manager, he said, ''If that was the best we could do,
to get it by all means,'' and the contract was closed at the rate
of $175 per annum. This action is brought to recover the
excess between the ordinance and the contract rate paid by
plaintiff for a period of nearly five years.

Upon the trial the basis of the right to recover was grounded
on the doctrine of duress. Such duress, it is contended, arises
by reason of the inequality of the parties to the contract and
the necessities of the plaintiff; that a metallic circuit service

telephone was imperatively needed to conduct and efficiently carry on its business; that defendant, a public utility corporation, was the only one who could furnish what was needed, as it has a practical monopoly of the telephone business in Chicago; that defendant was bound to supply such improved service telephone at the ordinance rate, and that plaintiff is not chargeable with knowledge of the ordinance regulating carges for telephones.

The contract at the $175 rate was entered into without any protest or complaint, other than a naturally expressed desire to procure a lower rate, if possible. Four times each year thereafter payments were made by plaintiff of a quarter of the annual contract charge without protest or complaint.

The evidence clearly establishes that plaintiff's grounded service telephone was reasonably efficient at and before the time of the change to the metallic circuit. Complaints were made of a buzzing and mumbling in the 'phone, and of difficulty in getting telephone connections, but when interrogated about these matters on cross-examination, the same witness admitted that there was always trouble, more or less, both before and since the metallic circuit was installed. Most of the trouble was with the busy signal—a buzzing of no uncertain sound, recognized readily by all users of telephones—but admits that when connection was once secured the talk was readily understandable.

By the ordinance defendant was obligated to furnish the improved service of metallic circuit at the ordinance rate, $125, and the exaction of $175 was, as to the excess of $50, unwarranted, and a sum to which in law the defendant was not entitled. Such is the logical deduction from the decisions in *Chicago Telephone Co. v. Illinois Manufacturers Association*, 106 Ill. App. 54, and *People ex rel. v. Chicago Telephone Co.*, 220 Ill. 238. Neither the questions of duress in the making of contracts at a greater rate than limited by the ordinance, nor the right to sue and recover such excess were involved or decided in these cases. Any expressions in these opinions susceptible to a contrary construction are clearly *obiter*.

It appears from the opinion in the case of *Chicago Tele-*

*phone Co. v. Illinois Manufacturers Association, supra,* that defendant attempted to justify its exactions of contracts of the same general character as the one in evidence here, upon the claim that the limitation as to tariff contained in the city ordinance had no application to the subsequently invented improved metallic circuit—a claim effectually disposed of in that case against defendant, and as effectually settled against defendant in *People ex rel. v. Chicago Telephone Co., supra;* the first being a bill to reform certain contracts in this particular by making them conform to the ordinance rate in place of the exacted excess rate; the second, a *quo warranto* proceeding into which defendant injected the question by a plea in bar, which was held to be obnoxious to a demurrer, the court saying, p. 250: "Under the ordinance the defendant can not be required to adopt improvements in the service or equipment, or to keep up with the general progress in the business, but if it sees fit to adopt improvements and furnish a better grade of telephone service, it can only have the benefit of the ordinance granting it the right to use the public streets by complying with the terms of the ordinance and not increasing the rates."

It is undoubtedly true that both parties, at the time of the making of the contract for the metallic service, were of the opinion that defendant had the right to exact the terms it did for the improved service it thereby contracted to supply. Nothing was said or done at this time by defendant which gives color to the claim that plaintiff acted under duress in executing the contract. The very absence of all discussion upon the relative rights of the parties, the failure to challenge defendant's right to demand compensation in excess of $125, plainly inhibit any assumption that plaintiff in executing the contract was impelled thereto by duress. All the steps taken leading up to its execution seem to have been voluntary. The defendant in the first instance was approached in relation to the matter by plaintiff; the negotiation was opened by it. The matter was concluded without protest on the part of plaintiff and without any threat on the part of defendant to disturb the existing telephone service then in operation in

plaintiff's place of business. Nor does the evidence disclose any immediate necessity for the metallic circuit service, the grounded service being in the same working order in which it had been for some time previous. There was no change in plaintiff's business or the manner of its conduct necessitating an immediate abandonment of the grounded service. It was usable and practically efficient.

A careful examination of the many authorities cited fails to disclose any case held to constitute duress, which when applied to the facts here justifies the application of that doctrine. There are many definitions of what constitutes duress to be found in the books. That by Judge Cooley is in keeping with his high reputation: "Duress exists when one by the unlawful act of another is induced to make a contract or perform some act under circumstances which deprive him of the exercise of free will." *Hackley v. Headley*, 45 Mich. 569.

There must be present a consciousness of the demand being unlawful. Surely there is nothing in the evidential facts or the disclosures appearing in the cases in 106 Ill. App. and 220 Ill., heretofore cited, from which an inference can be drawn that defendant or its officers had any consciousness of the demand made being unlawful. It is admitted that plaintiff had none, and the trend of the authorities is to the effect that both parties must have a consciousness of the demand made being unlawful at the time, in order to constitute an acquiescence in such demand duress. But it is said that the inequality of the parties, the power of defendant, by reason of its monopoly of the telephone system, to compel a compliance with its demands, is of itself duress. If plaintiff's attitude rested upon legal authority, can it be said there are any facts upon which the law may operate? As before said, there was no immediate demand for the change, or threat to deprive plaintiff of its fairly efficient grounded service telephone. Plaintiff made no claim that the law vested him with a right to metallic circuit service at the existing rate. Nothing was said or done which by the most liberal construction can be held to have even tended to deprive plaintiff of the exercise of its free will. As in *Siegel v. Schueck*, 67 Ill. App. 296, it was a case of tame submission, without protest or even complaint. . .

Following upon the execution of the contract for metallic circuit service and its establishment upon the premises of plaintiff, came the quarterly payments made by plaintiff to defendant without protest of any character or suggestion that defendant was receiving more than its due. No discussion or contention of any sort about these payments. No question ever appears to have been raised by either party during the period of nearly five years, in which were annually paid $50 in excess of the ordinance rate. Is there room for dispute that all these payments were voluntary, with knowledge imputable to plaintiff of its rights and the environing conditions?

*Cincinnati v. Gas Light & Coke Co.*, 53 Ohio St. 278, is the case of a public-service corporation, in which it was held that although excess payments could not be exacted in the future, yet excess payments voluntarily made in the past could not be recovered back. While the cases are not exactly parallel, the principle involved is the same. A citizen would have no greater right than the municipality. The city's need for gas was just as imperative, if not more so, than that of the citizen, and the only source of supply was the defendant gas company. The decision rested on the payments being voluntary.

The trend of the rule established by the decisions in this jurisdiction is that money voluntarily paid, without protest and where there is not present the element of duress, cannot be recovered back, where it appears that the parties either knew or were chargeable with knowledge of their rights and of the unlawful exaction at the time of payment. This is the rule in tax and water and gas cases without exception.

*Elston v. Chicago*, 40 Ill. 514, was a special assessment, which the court held was without the power of the council to make and was void. Yet the payment, though after judgment, was held to be voluntary, because there was neither precept nor execution through which collection could be enforced. The decision of the court was not grounded—as contended by plaintiff—on the fact that the payor's property had been greatly benefited by the improvement made. This fact was referred to only incidentally, but not as varying the

rule of law, for the court said: "No case can be found where money has been voluntarily paid with a full knowledge of the facts and circumstances under which it was demanded, which holds that it can be recovered back upon the ground that the payment was made under a misapprehension of the legal rights and obligations of the party paying, and it is invariably held that a payment is not to be regarded as compulsory unless made to relieve the person or property from an actual or existing duress imposed upon him by the party to whom the money is paid, and such is the tenor of all the cases cited by appellant. * * * No well-considered case anywhere has proceeded upon different principles." *Conkling v. Springfield,* 132 Ill. 420; *Preston v. Boston,* 12 Pick. 13.

Illegal fees paid to a county clerk, being held to be voluntary payments made without protest, were held not recoverable back in *Village of Morgan Park v. Knopf,* 199 Ill. 444. The fees sought to be recovered were paid for issuing tax deeds, the parties here were not on an equality, the tax deeds could not be procured elsewhere, and the village was entitled to them as a matter of law, without payment of the exaction held illegal. The court said: "There was no fraud or mistake of fact, and if there was any mistake, it was one of law, the money having been voluntarily paid under such circumstances no action would lie to recover it back. This rule, which is well settled as between individuals, has been extended to municipal corporations under similar circumstances."

*Stover v. Mitchell,* 45 Ill. 213, was a case where payment was made in the mistaken belief—of law—that an execution was a lien, when in fact it was not. On suit to recover back payment the court held "that in order to render a payment compulsory such a pressure must be brought to bear upon the person paying as to interfere in some way with the free enjoyment of his rights of person or property. * * * In this case the sale was not advertised * * * and Stover was under no necessity of hasty action, and would have had several weeks in which to sue out an injunction." So here, plaintiff evidently mistook his legal rights under the ordinance, and in ignorance of the law affecting the contract,

freely, tamely and unprotestingly entered into it, and in faith of it uncomplainingly and voluntarily continued for nearly five years to pay the excessive contract price, a condition from which it could have been relieved at any time by protest, which, if unavailing, then by the aid of an injunction and a bill to reform the contract, as was done in *Chicago Telephone Co. v. Illinois Manufacturers Association, supra.*

*Yates v. Royal Insurance Company,* 200 Ill. 202, is a case where the doctrine of voluntary payment was carried to its extremity. Yates was state superintendent of insurance, and the Royal Insurance Company, a foreign insurance company doing a fire business in Illinois. An Illinois statute of 1899, as a condition precedent to a foreign insurance company's doing business in this state, required it to pay two per cent. upon the gross amount of premiums collected by it during the previous year. This act being declared unconstitutional, suit was brought against Yates in his official capacity to recover back the money so paid, which Yates admitted he still held to await the result of the litigation. The proof showed that the money was paid under threat by Yates as state superintendent of insurance to exclude and prevent the company from doing business in this state. The right of recovery, however, was denied on the theory that the payment was voluntary, and despite the contention that the money was extorted by the power of the state, which it was futile to combat, and that the parties were not on an equality or equal footing. Here there was lacking a consciousness of illegal demand, because all parties believed at the time the law was valid; that therefore the mistake was one of law and not of fact, and the trial court, holding to the contrary, was reversed.

Numerous other cases might be cited, but these are reasonably sufficient and conclusive on this point. The converse of the proposition is well illustrated by the case of *City of Chicago v. Northwestern Mutual Life Ins. Co.,* 218 Ill. 40. Here the insurance company had acquired title to certain buildings, from which the city threatened to cut off the water supply on a claim against former owners for water furnished the buildings. Water in the buildings was a necessity. It could only

be procured from one source, the city. The payment sued to recover back was made on the threat of the city to disconnect the water supply, and under protest. It was held, the claim being no lien upon the property nor an obligation chargeable against the payor, and the city having the power to put in execution its threat, the payment was adjudged to have been made involuntarily under duress and with protest, and recoverable back—essential elements and conditions wholly lacking here.

Upon like legal theories and under similar conditions payments were adjudged to have been made under duress and involuntarily in *County of La Salle v. Simmons*, 10 Ill. 513, and *Bradford v. Chicago*, 25 Ill. 411.

It is next contended by plaintiff that the payments sought to be recovered back were made in ignorance of a material fact, which fact is alleged to be the ordinance limiting the tariff on telephones within the blue line district to $125 per annum. This raises the question whether the ordinance of 1889 is a law in the sense that ignorance of it will not excuse.

In *Marshall v. Coleman*, 187 Ill. 556, it was said: "Ignorance of law which will not excuse, is ignorance of the law of one's country or state, but the laws of foreign countries or other states are facts." This may be conceded to be a correct statement of the law. It is also true that the courts do not ordinarily take judicial cognizance of foreign laws or municipal ordinances. But municipal ordinances which are general in their application and define the rights of citizens generally, under certain specified conditions, and when of such a nature that it may be invoked by all citizens desirous of availing of its provisions, then it is a general law, binding on all citizens who by their actions bring themselves within its purview. It is as binding within the municipal limits as the statute of a state is within the bounds of such commonwealth.

The supreme and appellate courts of this state have expressly held this ordinance to be a law in the two cases first referred to, in which the defendant here was a party, and in which the validity and binding force of the ordinance as a municipal law was before these courts for construction. That

the ordinance is not a mere contract or agreement between the city and defendant, but something more, is evident from the fact that in *People v. Chicago Telephone Co.*, 220 Ill. 238, it was held that it applied to annexed territory, immediately upon annexation. It operates upon the public of the municipality generally, whatever its extent, during the term of twenty years to which it is limited. The council derives its powers from the legislature, and where ordinances of a general character are passed within the limitations of such granted power, they are as much laws as they would be if passed by the legislature had such power not been delegated to the council.

Much of the argument in behalf of plaintiff has been directed upon the theory of the higher duty resting upon defendant as a public utility corporation, in virtue of the restrictions upon its natural right and power to contract or be contracted with under this ordinance—a municipal law as binding and conclusive as any other law—ignorance of which is ignorance of law and not of fact. No rights can be predicated upon a claim of ignorance of this municipal law.

But it is urged that the schedules of tariff furnished by the defendant in compliance with the ordinance and filed with the city clerk are no part of the ordinance and do not appear in the municipal code. Even so, that fact—if it is a fact—is of no controlling importance and has no bearing on the issues here under the evidential facts, for upon looking at the ordinance itself we find that section 6 provides, among other things (see page 2, plaintiff's first brief): "Said company during the term for which this ordinance is granted shall not increase to its present or future subscribers the rates for telephone service now established."

Knowledge of this provision of the municipal statute being imputable to plaintiff, and it having a telephone at the time of making the contract for the metallic circuit service, it follows as a matter of law that it had knowledge of the rate for which it was entitled to the improved service, and therefore in executing the contract and in payment at the contract rate, it acted voluntarily, from the binding force of which it can-

not escape by a plea of ignorance of the ordinance. Consequently testimony tending to prove such ignorance is not material and is inadmissible. It is a complete answer upon any theory as to the effect of the schedules filed, that reference to them would not have furnished any information not found in the very letter of the ordinance.

*Capital Gas & Electric Light Co. v. Gaines,* 20 Ky. L. Rep. 1464, 49 S. W. 462, arose in Kentucky, which is colloquially known as a "Code State." It was expressly held as a matter of law in that forum that money paid through mistake of either law or fact may be recovered back. This is contrary to the law in this jurisdiction. The Kentucky court grounded its decision on the following *dicta* in *Ray v. Bank,* 13 B. Mon. 510, quoted with approval in *Louisville & N. R. Co. v. Hopkins,* 87 Ky. 613: "Upon the whole we would remark that whenever by a clear and palpable mistake of law or fact essentially bearing upon and affecting the contract, money has been paid, without cause or consideration, which in law, honor or conscience was not due and payable, and which, in honor or good conscience ought not to be retained, it was and ought to be recovered back." Many cases cited to like effect are subject to the same criticism.

The quotation from *Marshall v. Coleman,* 187 Ill. 556, on page 122, plaintiff's reply brief: "Ignorance of law, which will not excuse, is ignorance of the laws of *one's own* country or state," may consistently be amplified as a correct legal proposition suited to this case by adding "or city." Such municipal laws being those ordinances which are public as distinguished from private, and of a general character in their operation upon the public within the limits of the municipality, and which may be invoked by all citizens at their will, without discrimination and upon equal terms. Such is the character and scope of the ordinance of January 4, 1889.

Plaintiff also predicates its right of recovery in virtue of the maxim *ex æquo et bono.* This maxim, in its practical application, is one of equity. The remark of Judge Story in his work on Equity Jurisprudence, sec. 965, is forcefully applicable to the facts of this case. "Indeed," says this jurist,

"it is impossible to suppose that, in a country professing to have an enlightened jurisprudence, obligations and trusts in regard to property binding in conscience and duty, and which *ex æquo et bono* the party ought to perform, should be left without any positive means of securing their due fulfillment, or that they might be violated without rebuke or evaded with impunity."

Defendant had no right or power to exact more than the ordinance rate, in morals and in law, in honor and in good conscience. Such exaction was unwarranted and in all conscience should be returned. Still many rights are impossible of enforcement by reason of long acquiescence or for a failure to protest at the appropriate time. None of the authorities cited on this contention in behalf of plaintiff, when weighed with the facts, are of controlling force here.

*Moses v. Macferlan*, 2 Burrows, 1005, is in some respects a remarkable case. There Macferlan induced Moses to endorse certain notes, without consideration and with the distinct understanding in writing that he should not be held to the responsibility consequent upon his act of endorsement. In violation of this compact, Macferlan sued Moses, and in the court of conscience, under a decision of the commissioners, they holding that Moses, admitting his execution of the notes, could not invoke the circumstances of their procurement as a defense to the action, Moses paid the amount claimed into court. On Macferlan's taking the money out of court, Moses sued him to recover it back as money had and received to his use, as money which *ex æquo et bono* did not belong to Macferlan. Here was the grossest kind of actual fraud and base deception. No mistake of either law or fact, but an unconscionable swindle, to redress which a court of law gave that ultimate relief which a court of conscience had refused—a remarkable case of legal contradictions. While in many of the cases expressions may be found seemingly in point, when analyzed they are as impotent as legal factors here as *Moses v. Macferlan, supra.*

The application of equitable principles found in the English cases at common law arise from the fact that by the English

judicature act the rule of judicial interpretation is "that when the rules of the common law conflict with those of equity, every court is to give effect to the latter," and like judicial interpretation at common law at an earlier date rests on the fact that many of the strict rules of the common law were materially modified by the common-law Procedure Acts of 1852–4. Authorities from so-called "Code States," where the distinctions between common law and· equity causes are abolished, are out of harmony, for that reason, in this forum, where the distinctions of common law and equity are still preserved. It is evident from the Yates and other cases in this state, that the strict rules of the common law controlling this case have in no way been modified either by statute or judicial construction.

It may appear to some an anomalous condition that money which in conscience ought not to be retained cannot be recovered back in an action at law; but it is of common occurrence, in this jurisdiction, that actions may be maintained to enforce rights in the equity branch of the court, where the common-law branch of the court is impotent to afford relief. Notwithstanding relief, in my judgment, cannot be obtained in this form of action, in this and kindred cases, yet if a court of equity acquires jurisdiction in such cases to grant relief, the maxim *ex æquo et bono* may receive an additional exemplification.

The plaintiff's motion for a new trial is overruled, with a judgment upon the verdict as directed, and against the plaintiff for costs.[1]

[1] The above case is now pending in the appellate court on appeal, but on account of the importance of the case, and the number of similar cases pending it is deemed advisable to publish the above opinions. For note on question of whether excess payments to public service corporations are voluntary see *Illinois Mfr's Ass'n v. Chicago Telephone Co.*, 1 Ill. C. C. 119, *supra.*—Ed.